596 P.2d 75

**Herbert L. RUETH and Kathleen J. Rueth, husband and wife, Plaintiffs-Respondents,**

v.

**The STATE of Idaho, Robert G. Kalb, Paul Keeton, John Eaton, Jack Hemingway, and H. Jack Alvord, as Commissioners of the Idaho Fish and Game Commission, and Joseph C. Greenley, Director of the Idaho Fish and Game Department, Defendants-Appellants.**

No. 12132.

Supreme Court of Idaho.

July 10, 1978.

Rehearing Denied June 11, 1979.

Wayne L. Kidwell, Atty. Gen., Boise, T. J. Jones, III, Legal Counsel for Idaho Fish & Game Commission, Boise, for defendants-appellants.

Peter J. Boyd and Phillip M. Barber of Elam, Burke, Jeppesen, Evans & Boyd, Boise, for plaintiffs-respondents.

BISTLINE, Justice.

The State of Idaho's Fish and Game Department appeals a jury verdict in favor of plaintiffs-respondents Rueths. The Rueths brought suit in October, 1972, claiming that the Fish and Game Department's operation of a water diversion structure and resultant flooding "effected a complete loss of value of said lands of plaintiffs and, therefore, constitutes a taking of said lands of plaintiffs by defendants." The prayer of plaintiffs' complaint asked that a jury trial be had to ascertain and assess "the plaintiffs' damages by reason of the loss of the total amount of property taken by the Defendants." Fish and Game denied the taking and denied any responsibility for the alleged flooding.

After plaintiffs and defendant rested, the trial court gave a number of instructions as to what the jury might find constituted a taking. The jury was also instructed that, if they found a taking, the measure of damages "is the difference between the fair market value of plaintiffs' property before the taking and the fair market value of plaintiffs' property immediately after the taking."

The jury returned a general verdict awarding the plaintiffs damages in the sum of $127,000. The jury was not requested to determine the extent of the taking if less than total, nor the before and after values of the plaintiffs' property. The judgment entered on the verdict merely recites the verdict, and judgment in that amount was entered in plaintiffs' favor. The judgment, as with the verdict, does not establish the property or property right taken by the Fish and Game Department. The record before us discloses no post-judgment motions. This appeal followed.

On appeal, the Fish and Game Department challenges the sufficiency of evidence to support the jury verdict of a "taking" as well as the amount of damages in the resulting award. The Department likewise

assigns as error numerous trial court rulings regarding admissibility of evidence, instructions to the jury and the denial of a jury view of the subject premises. The Department urges also that the trial court's communications with the jury outside the courtroom and off the record constituted reversible error. Our ruling on this latter issue is dispositive of the appeal.

On September 27, 1976, pursuant to I.R. C.P. 60(a), appellant Fish and Game Department filed in this Court a motion to correct clerical error, requesting that the record on appeal be corrected so as to show that after the jury retired to consider this case on the afternoon of October 10, 1975, they sent a written message to the trial judge requesting further instructions and that written instructions were then given to the jury in the absence of counsel for the Department. In reply to this motion, counsel for Rueths stated that he had "no objection to the entry of a minute entry memorializing the occurrence" but insisted that such minute entry not "reflect the erroneous statement of facts contained in the supporting affidavit" of counsel for the Department. Accordingly, this Court, in an order dated November 9, 1976, granted the motion and remanded the cause to district court with directions to correct the record. In addition, we ordered that

if the written material in question is in possession of the District Court that it be forwarded with the corrected record to this Court, and if such written material is not available that the District Court forward the next best evidence relative to the Jury's inquiry and the Judge's response to this Court.

On remand, it was determined that no official record had been kept of the communication from the jury to the trial court or the communication given by the court to the jury, and that the original writings themselves had both been destroyed. Consequently, the parties attempted to reconstruct the events by way of affidavits. The trial judge, the bailiff, the court reporter and the clerk of the court all averred that they had "no independent recollection" of the occurrence. Counsel for the Rueths stated his own recollection as follows:

Immediately following the submission of the case to the jury in this action, counsel for the defendants, the Fish and Game Commission, advised your affiant and everyone else in the courtroom that he was hurrying to catch an airplane to attend a football game. Your affiant believes that the football game in question was scheduled for the following day in Moscow, Idaho. From that time forward, your affiant did not again see counsel for the defendants, the Fish and Game Commission, anywhere on or about or near the courthouse in Caldwell, Idaho.

In the early afternoon following the submission of the case to the jury, the bailiff requested that I see the District Judge. When I arrived at the District Judge's chambers, Judge Dunlap was standing outside with a note from the jury. He was asking his bailiff, clerk and reporter, as well as your affiant, where counsel for the defendants was. I responded that counsel for the defendants had gone to a football game in Moscow.

Counsel for the Rueths remembers that he told the judge "the preferable route to avoid error would be to make no further instructions, but to advise the jury to follow the instructions which it already had." According to the recollection stated in counsel's affidavit, the district judge agreed that this was the correct response and "then returned the note to the bailiff and told the bailiff to tell the jury to continue to look only to the instructions which had been given them."

Counsel for the Fish and Game Department, by affidavit, states: that he was present in the courthouse from 11:00 a. m. when the jury retired for its deliberations until noon at which time the jury took a lunch break as did counsel; thereafter, counsel along with a Department employee purchased a slide viewer to aid the jury should it care to examine certain slide exhibits more closely; after delivering the viewer to the bailiff around 1:00 p. m., counsel again passed the time in conversa-

tion with Department witnesses and employees in the courthouse; at approximately 2:00 p. m., he joined Judge Dunlap in his chambers for coffee; counsel recalls the judge as being surprised to see him still on the premises; counsel states that he remained in the courthouse until approximately 2:45 p. m. at which time he left for his office in Boise; a Department representative, Mr. Von Steen, was instructed to contact counsel by phone if any verdict was brought in by the jury; counsel then drove to Boise, dropped off a passenger and proceeded to his office where he arrived at approximately 3:30 p. m.; his secretary informed him that there had been no calls from Von Steen concerning the Rueth case; after doing some office work and confirming that there would be no stand-by room on the evening flight to Moscow, counsel went home and, shortly before 5:00 p. m., left by car for north Idaho. Based on the above account and the fact that the jury returned its verdict at 3:41 p. m., counsel speculates that the "early afternoon" communication between the judge and jury may well have taken place while he was still in the courthouse and that the misunderstanding as to his whereabouts may have discouraged any real attempt to locate him.

## I.

The question is whether the procedure which *took place after the cause had been submitted to the jury* constitutes reversible error. Plaintiffs-respondents Rueths argue first that, by absenting himself from "the courthouse, the city, and the county in which the case was being tried," counsel for the Fish and Game Department waived any objection to the proceedings which transpired in his absence. In support of this proposition, respondents cite *Meyer v. Dubinsky Realty Co.*, 133 S.W.2d 1106, 1111 (Mo.App.1939):

1. Any other rule would result in chaos. An unscrupulous or careless attorney could merely leave the courtroom after any jury retired, and seek to overthrow as a matter of law any verdict thereafter received (whether as the result of further instruction given in his absence, or not) upon the sole ground

Upon being advised that counsel had left the building, the court proceeded to listen to the inquiry of the one juror who was acting as spokesman for the entire group, and we think the court is in no manner to be criticized for not having held all other parties waiting until such time as defendant's counsel could be called away from his office. It was counsel's primary responsibility to be in attendance on the court until his case was finally concluded, and when he elected to leave the building, he should not charge error against the court for having continued to function in his absence.

The rule so stated is acceptable and we prefer it to that enunciated by those jurisdictions which hold that no communication whatsoever may occur between judge and jury unless both counsel are present or have expressly waived the right to be present. *See*, for example, *Neely v. Woolley*, 143 S.W.2d 1015 (Tex.1940); *Rowden v. American Family Ins. Co.*, 48 Wis.2d 25, 179 N.W.2d 900 (1970).

Respondents, however, overstate the nature of the waiver. What an absent counsel waives is only his right to be present and to object to the court's supplemental instructions.[1] He does not waive his right to have such instructions given in compliance with certain generally recognized procedures. As stated by the Third Circuit Court of Appeals:

The due process clause of the Fifth Amendment to the Constitution requires that a defendant be accorded the right to be present in person or by counsel at every stage of his trial. [Citations omitted.] Orderly procedure requires that a plaintiff be accorded the same right. A party or his counsel may waive this right expressly. He may also waive it by voluntarily absenting himself from the

that he did not return to the courtroom and that supplementary instructions were given the jury in his absence. This could never be permitted. No judge can surrender to counsel the conduct of a trial.

*Macartney v. Compagnie Generale Transatlantique*, 9 Cir., 253 F.2d 529, 535 (1958).

courtroom in which the trial is being conducted, and in that case the trial judge may proceed with the trial in his absence even to the extent of recalling the jury from their deliberations for such additional instructions on the law as occasion may require. [Citation omitted.] But . . . the parties are entitled to anticipate and bound to presume, in the absence of notice to the contrary, that all such proceedings will take place in open court in the courtroom assigned for the trial and will be reported by the court stenographer. Consequently *a party or his counsel who voluntarily absents himself from the courtroom consents to such proceedings only as take place in the courtroom in his absence but not to proceedings which take place elsewhere.* (Emphasis added.)

*Arrington v. Robertson,* 3 Cir., 114 F.2d 821, 823 (1940).

In Idaho, the procedures to be followed in dealing with a jury request for supplemental instructions are those laid down in I.R. C.P. 51(b):

Any request by the jury to be further informed of any point of law arising in the action shall be communicated in open court, at which time the attorneys for the parties shall be given the opportunity to be present, and the court in its discretion may further instruct the jury or explain the instructions in open court which shall be made part of the record.

and Rule 77(b):

A minute entry shall be made by the clerk of the court under the direction of the court of all court proceedings and filed in the official file of the action.

The rules of civil procedure thus provide that if, after start of its deliberations, a jury wishes further instructions, it must communicate this desire in open court. Counsel for both parties have a right to be present unless, by absenting themselves or by expressly so stating, they waive this right. The trial judge may, in his discretion, give or refuse to give any further instructions. All communication must be made a matter of record and a minute entry must be made to note the occurrence. It is clear that in the present case these procedures were not followed.

## II.

Respondents argue, in the alternative, that even if the rules have been violated and opposing counsel cannot be said to have waived compliance, the noncompliance which occurred here was "harmless error" and has not been shown by appellant to be prejudicial. In short, respondent would have us adopt a rule which places on an appellant (which might be a prevailing plaintiff as well as a losing defendant, or both) the double burden of showing both that a procedural violation has occurred and that such violation resulted in "actual prejudice." In considering that argument, we should be reluctant to overturn the results of a lengthy trial where the procedural violation amounts to a mere technicality, or where it is clear that the procedural violation occurred *after* the jury had actually reached its verdict, or where the misconduct involved could in no way have prejudiced and may even have benefited the losing party. *See,* for example, *Hammargren v. Montgomery Ward,* 172 Kan. 484, 241 P.2d 1192 (1952); *Meyer v. Dubinsky Realty Co., supra; McBride v. Johns,* 73 Ga.App. 444, 36 S.E.2d 822 (1946). These cases, and others cited by respondent, illustrate the fact that procedural violations come in many forms and in varying degrees of prejudicial impact. A *per se* rule requiring reversal in all instances would appear to be unwise.

At the opposite extreme, nonetheless, several jurisdictions appear to have adopted just such a *per se* rule whereby "any communication between the trial judge and the jury or members thereof after submission of the case, elsewhere than in open court, or in the presence, or with the consent of, counsel," is regarded as reversible error. Annot., 41 A.L.R.2d 227, 306 (1955). *See* the numerous cases cited therein. There is much to be said for this approach also. It is not without reason that procedural irregularities involving communication between the trial court and jury are judged by a far

stricter standard than those between jurors and other court officials. As noted above in *Arrington*, the parties have a right to be present at and to insist that every stage of the proceedings be conducted in open court. *See also Fillippon v. Albion Vein Slate Co.*, 250 U.S. 76, 81, 39 S.Ct. 435, 436, 63 L.Ed. 853 (1919); *Ah Fook Chang v. United States*, 91 F.2d 805 (9th Cir. 1937).

From a consideration of the values underlying each extreme position—namely, the duty to guard jealously the parties' right to be present at and to have a record made of every stage of the trial while, at the same time, respecting the outcome of lengthy and costly jury trials—has come a middle position. The starting point for this third alternative is that

> The failure to comply with any or all of the requirements of CR 51(i) [Washington's equivalent of I.R.C.P. 51(b)] makes any subsequent verdict questionable if not suspect . . . .

*Iverson v. Pacific American Fisheries*, 73 Wash.2d 973, 442 P.2d 243, 245 (1968). Still, reversal is not automatic:

> [I]t leaves the door open for a possible showing by the prevailing party that the failure to follow the requirements of the rule . . . was not really prejudicial.

*Id.* In sum, the third approach holds that procedural violations in this sensitive area are such as to make the resulting jury verdict questionable, trigger a close judicial scrutiny of what has occurred, and place on *the winning party* the burden of showing that no prejudice has resulted.[2]

## III.

The same rule has long been the law in Idaho. In *State v. Bland*, 9 Idaho 796, 76 P. 780 (1904), after presenting the same two extreme positions outlined above, the Court

declined to adopt a *per se* rule requiring reversal for every out-of-court communication between judge and jury, but nonetheless expressed its strongest possible disapproval of such a practice:

> While we are not willing to say at this time that any and all communications which might possibly take place between a trial judge and jury in the absence of the defendant, should work a reversal of the judgment, still we are strongly persuaded that such communications should never take place, and the interests of justice, and the confidence of the public and parties litigant in legal proceedings, and the preservation of the recognized and established rules of practice and procedure demand that all communications between judge and jury take place in open court.

9 Idaho at 804, 76 p. at 782. Thus, in Idaho, it is definitely not the case that the losing party has the double burden of showing both that a statutory violation has occurred *and* that "actual prejudice" has resulted. The Court in *Bland* was at pains to reject any such suggestion:

> It is too often that refuge from the results of positive violation of statutory provisions and settled rules of practice is taken behind the much-abused excuse that the error was not prejudicial to any substantial right of the defeated party. . . . The law has its best observance and commands the highest respect where its sanctity and inviolability in all its provisions is uniformly recognized and enforced by the courts. The interest of the people at large in maintaining its administration above reproach must always equal if not exceed the private or personal interest of any litigant.

---

**2.** Though not cited to us by respondent, reliance might have been placed on the "harmless error" rule stated in I.R.C.P. 61. The third approach, adopted herein, conforms to the better reasoned interpretations of Rule 61. As former Chief Justice Traynor of the California Supreme Court has remarked, the judgment below is suspect whenever an error has oc-

curred which is more than a "mere technicality" and which affects a substantial right and "unless the appellate court believes it highly probable that the error did not affect the judgment, it should reverse." Traynor, The Riddle of Harmless Error, 1970, 35. *See also* 11 Wright & Miller, Federal Practice and Procedure § 2883, p. 275.

9 Idaho at 805,[3] 75 P. at 782–783. According to the Court in *Bland*, these policy considerations are safeguarded by strict compliance with Section 7903 of the Revised Statutes (which embodied substantially the same procedures as present I.R.C.P. 51(b)). It followed that the improper behavior of the trial judge in that case required the Court to set aside the jury verdict.[4]

In formulating the procedure to be followed in Idaho, the Court in *Bland* quoted approvingly from 1 Hayne, New Trial and Appeal § 39, as follows:

> "That where the losing party shows that some private communication was made by the judge to the jury, it devolves upon the successful party to show what the communication was, and that unless he does this the verdict must be set aside; that where it clearly appears what the communication was, then, if it be of such a character that it may have affected the jury, the verdict must be set aside; but that, if the court can see from the record that it could not have had any effect, the verdict should stand."

9 Idaho at 803, 76 P. at 782. *See also State v. Baker*, 28 Idaho 727, 156 P.2d 103 (1916); *State v. Sly*, 11 Idaho 110, 120, 80 P. 1125 (1905).

The wisdom of the four-step procedure outlined above is particularly evident in the present case where, as in *Bland*, no record has been kept of the communications between judge and jury and the entire occurrence must be reconstructed by memory long after the event. To summarize: (1) It is for the losing party, in the first instance, to show that there was some communication off the record and not in open court. (2) The burden then shifts to the winning party to show what the communication was. If he cannot show what it was, the verdict must be set aside. (3) If he can show what the communication was but it appears to have been of such a character that it *may* have affected the jury, then the verdict must be set aside. (4) Only if it is made clearly to appear that the communication *could not have had any effect*, can the verdict be allowed to stand.

In the present case, respondent has not succeeded in satisfactorily establishing the nature and extent of the communication. Evidence as to the content of the communication between the judge and jury was sketchy and conflicting. As mentioned earlier, the trial judge and all court personnel possess "no independent recollection" of the communication whatever. Prevailing counsel urges that the incident had minimal impact, saying that the trial judge only "told the bailiff to tell the jury to continue to look only to the instructions which had been given them." Such an oral communication from judge to bailiff to jury, by its very nature, would be difficult to reconstruct. Here it is impossible. Neither the trial court nor the bailiff even recall the incident—let alone what may have been said. Prevailing counsel is unable even to reconstruct the initial step. His affidavit concludes: "I do not recall the precise words used by the District Court when returning the note to the bailiff." Had counsel recalled the precise words which he heard the court use, the further problem would remain as to whether the bailiff communicated the same words to the foreman of the jury, and whether the foreman accurately told the other jurors what the message was from the judge. Such oral communications, precisely because they are so open to dispute after the fact and because their impact upon the jury cannot accurately be determined, constitute grounds for reversal. *Lloyd v. St. Louis Public Serv. Co.*, 360 Mo. 91, 227 S.W.2d 460 (1950); *Guzzi v. Jersey Central Power & Light Co.*, 36 N.J.Super. 255, 115 A.2d 629 (1955); *Peters v. State*

---

3. A similar conclusion has recently been reached by the Supreme Court of Appeals of West Virginia after a scholarly survey of each of the more extreme positions. *See Klesser v. Stone*, 201 S.E.2d 269 (W.Va.1973).

4. *Bland* was a criminal case. However, as the Supreme Court of Montana stated recently, there is no "double standard that can be applied to the sanctity of a jury's deliberations based on criminal or civil process." *State Highway Comm'n v. Dunks*, 166 Mont. 239, 531 P.2d 1316, 1318 (1975).

*Industrial Accident Comm'n*, 236 Or. 27, 386 P.2d 800 (1963).

Here the communication, and even the form it took, are in dispute. According to the affidavit of Conley Freeman, a juror,

> the jurors wrote a message to the judge requesting explanation of the court's instructions on the question of what constitutes a "taking" under the law of eminent domain, and on the question of the proper measure of damages.

Contrary to the recollection of respondents' counsel, the juror says the district judge replied to the jury by way of a *written* message "to the effect that the questions asked were immaterial and that the jury was to make its decision based on the instructions already given."

According to the affidavit of Delwin W. Hobza, foreman of the jury, we are told that the written note from the district judge was destroyed by the jurors after their deliberations. Hobza's affidavit further states that the precise point of the jurors' note was to ask the court for "an instruction as to whether or not the plaintiffs would continue to own the subject real property following entry of judgment" and that the trial judge's reply was,

> that the question was not material to our deliberations, that no further instructions would be given in answer to the question. . . . The jury then did follow those instructions, and following the court's response, did not further pursue the question presented in the aforesaid note.

It would seem to us that the question as to whether or not the Rueths "would continue to own the subject real property following entry of judgment" was extremely material to the outcome of this case. It went to the two most fundamental questions of this case, namely, whether there had been a complete or only a partial taking, and whether damages should be awarded for the full or only the diminished value of the Rueths' property.

It is entirely possible that the jury intended their verdict to represent an award of damages for a "complete taking." It is equally possible that the jury reached its award of damages to compensate for the taking of a flood easement. All this is, of course, conjecture. But that is the unfortunate result when the procedures laid down in I.R.C.P. 51(b) are not followed. As Justice Ailshie stated in *Bland*:

> The danger of such a practice [communicating with a jury out of court] is illustrated by this case. The only way in which a record can be made as to what occurred between the judge and jury in such a case is by affidavit; but here it transpires that the judge of the court must actually make affidavits in his own court to show what has taken place between himself and the jury, while in fact he is provided with an official stenographic reporter whose duty it is to make a record of all the proceedings.

9 Idaho at 804, 76 P. at 782.

On this appeal, the prevailing party has failed to show clearly what the communication was between the trial judge and the jury. In the absence of such a showing, it is impossible to say that appellant was not prejudiced by the communication which did occur. The judgment is accordingly reversed and the cause remanded for a new trial.

McFADDEN and BAKES, JJ., concur.

BAKES, Justice, concurring specially:

I recognize that this case is being reversed and remanded for another lengthy trial because of what may fairly be described as a narrow procedural irregularity in the first trial. Nevertheless, I believe that in the circumstances of this case that procedural error requires reversal of the verdict and a new trial, and I therefore concur in the majority opinion.

However, I must also add that even absent that procedural error the verdict and judgment in this case could not stand. This case was tried on the theory of inverse condemnation. Though a somewhat unusual variant of the more typical condemnation action, this case is nonetheless still a condemnation action. As such, the final judgment must determine two essential ele-

ments of the cause of action: (1) the property interest taken by the state, and (2) the compensation due the private owner. Here, the judgment fixes the compensation due the respondents, but it is impossible to determine from the judgment, verdict, jury instructions or pleadings precisely what property interest the state unwittingly condemned, i. e., all or part of the fee or just a flood easement. This defect is underscored by the affidavit of Delwin W. Hobza, jury foreman, which states that the jury's note to the court sought "an instruction as to whether or not the plaintiffs would continue to own the subject real property following entry of judgment." A determination of what property interests were taken is a necessary prerequisite to any determination concerning compensation. A fixing of the property interests is essential to a final judgment in a condemnation suit and absent that determination the judgment in this case could not be upheld regardless of the procedural irregularities.

SHEPARD, Chief Justice, dissenting.

I believe the focus of the majority opinion is too narrow and I dissent. This appeal results from a jury verdict and judgment entered thereon following a lengthy trial on the issue of inverse condemnation. It was alleged that plaintiff's land was being "taken" by the action of the State defendant-appellant in changing the flow of a stream and raising the water level to make plaintiff's lands useless. The trial was the usual array of expert witnesses, together with voluminous exhibits and documentary evidence. As I perceive the record, the principal issues were whether the water cast upon plaintiff's land was the result of action by the state and if so the extent of the damage to the plaintiff's land by a comparison of the values of that land before, as contrasted with after, the State's action.

The State, as appellant, raises numerous assignments of error on appeal, i. e., that the verdict of the jury is not supported by the evidence; that the court erred in failing to grant a jury view of the premises; that appellant's motions to dismiss for failure to state a claim should have been granted; that the court erred in denying the State's motion for summary judgment and also erred in denying the State's motion for a bifurcated trial; that the court did not give accurate and proper instructions regarding the credibility of witnesses and impeachment and damages; that a special verdict instead of a general verdict should have been required and returned; that the court did not determine the State's interest in the Rueth property and failed to grant the State title to that property in fee simple absolute; that the trial court should have admitted testimony as to mitigation of damages on redirect; and that the court erred in refusing to admit evidence of the price paid for certain nearby and abutting lands. Although the majority opinion reverses and remands for a new trial, none of the above issues raised by the State on its appeal are treated or resolved. Thereby, I think the majority opinion seriously errs since no guidance is given to the trial court upon remand. If we are to assume by the majority's silence regarding these matters that no error was committed as charged by the appellant State, we are then left with the clear inference that the whole matter is being remanded for a new trial solely on the basis of what, in my opinion, on the facts and circumstances of this case, is harmless and nonprejudicial error.

Following the trial, a jury verdict was returned and a judgment entered thereon. No motion for a new trial was made by the appellant State. However, some five years after the events that allegedly damaged the defendant's property, the State, during the course of its appeal to this Court, moved to augment the transcript of the proceedings below to indicate a communication "not in open court" between the judge and jury. At that point affidavits came flooding to this Court indicating various views of what had transpired between the time that the jury retired to consider its verdict and the time the verdict was returned. In my view, however certain matters are clear. A written note passed from the jury to the judge soliciting some additional instructions or advice. At the time of the receipt of the note,

the judge found counsel for respondent available (at least counsel for the respondent states he was with the judge) and according to the affidavit of counsel for respondent, counsel for appellant State was not to be found in the courthouse. We are not told if the clerk of the court or the court reporter was in the courtroom or in the chambers of the judge at the time of the receipt of the note from the jury. According to their respective affidavits, neither the judge, the court reporter nor the clerk has any independent recollection of the events. According to the affidavit of counsel for respondent, he consulted with the judge regarding the request from the jury and advised the judge, in his opinion, that to avoid any error the judge should give no further instructions. He also states that the judge advised the bailiff to, in turn, advise the jury that it would receive no further instructions and they should follow the instructions they had already received.

It is against this background of facts that the majority opinion lays down its ruling that "there was some communication off the record and *not in open court*." (Emphasis supplied.) Thereafter, the majority states the "winning party" must show what the communication was and that it "*could not have had any effect*" (emphasis in original), otherwise, the judgment must be reversed. Thereafter, the majority opinion indulges in "conjecture" and speculation regarding what impact such communication might have had on the jury.

In my judgment, the majority fashions a rule which is neither necessary nor desirable considering the circumstances of the instant case. Further, I believe it will have a broad impact in the future in unnecessarily complicating the conduct of trials and will prevent the exercise of discretion by trial judges in their supervision of juries and the jury process, which considering the nature of the process must in many respects be based on practicalities and common sense.

The fashioning of the majority's rule is based in large part on, and buttressed by extensive quotations from, the case of *State*

*v. Bland*, 9 Idaho 796, 76 P. 780 (1904). That decision was in other times and what the majority does not tell us is that the circumstances underlying that decision were very different from the case at bar. In *Bland* the defendant was charged and tried for murder. In *Bland* the defendant moved for a new trial on the basis that "without the knowledge or consent of the defendant or his counsel, the trial judge, in response to the request from a juror, *appeared in the jury room* at about the hour of 9 o'clock on the morning of August 1st, and prior to the finding of the verdict, and had some conversation with one or more of the jurors * * *." 9 Idaho 800, 75 P. at 780–81. Among other things, the judge discussed with the jurors certain included offenses and the effect of a recommendation of mercy and the lighest punishment that could be administered to defendant. The judge indicated to the jury that the lightest penalty would be a period of one year imprisonment in the state penitentiary. However, upon sentencing the trial judge promptly sentenced the defendant to a ten year sentence.

The majority opinion also suggests that the Idaho cases of *State v. Sly*, 11 Idaho 110, 80 P. 1125 (1905), and *State v. Baker*, 28 Idaho 727, 156 P.2d 103 (1916), are worthy of examination. As the titles would suggest, both cases were criminal in nature. In *Sly* the only question involved which is even remotely of interest here was the "separation" of the jury. There one juror was separated from the remainder of the jury because of illness and another was allowed to step aside from the remainder of the jury to call for his mail at the post office. The court said in *Sly*, "We are of the unanimous opinion, however, that the conduct of the jury bailiff in this case is reprehensible, and calls for severe rebuke," 11 Idaho at 121, 80 P. at 1129. The court, after thoroughly castigating court personnel, stated, "As before observed, while some irregularities have occurred, we think the ends of justice have been met in this case, and the judgment will therefore be affirmed." *Id.* at 122, 80 P. at 1129.

*Baker* was an appeal from an order denying a motion for a new trial. Baker had been convicted of assault with a deadly weapon, to-wit: a broom: It was argued that while the jury was viewing the premises on which the alleged assault took place, there were some conversations by or between the jury and the persons occupying the premises. Nevertheless, the court affirmed the conviction of the defendant on the basis that the appellant had failed to act promptly to advise the trial court of the alleged error.

In *Guzzi v. Jersey Central Power & Light Co.*, 36 N.J.Super. 255, 115 A.2d 629 (1955), the court reversed a judgment based on the jury verdict because of error in instructions. The court stated, "The errors to which we have referred oblige us to reverse the judgment and direct another trial of the action. This consequence induces us to comment briefly upon two additional points agitated by the appellant." 115 A.2d at 633. Thereafter the court in pure dicta criticized the action of the trial judge after the jury had sent word to the judge that they would like to be fed and they would like to have the testimony of one witness sent to them and the judge ordered them fed and sent word that they could not have the testimony of the witness. The dicta of that court does not recommend itself to me.

In *Peters v. State Industrial Accident Comm'n*, 236 Or. 27, 386 P.2d 800 (1963), a trial judge delivered additional and oral instructions after the jury had retired and without the presence of any counsel. Thereafter, upon a motion for a new trial, the trial judge recited those facts and stated, " 'For the foregoing reasons, the Court believes that the plaintiff was not afforded a fair trial, and that a new trial should be ordered.' " *Id.* From an order for a new trial, an appeal was taken and the trial court was affirmed.

Likewise, in *Lloyd v. St. Louis Public Serv. Co.*, 360 Mo. 91, 227 S.W.2d 460 (1950), a trial judge granted a motion for a new trial on the basis that he, the trial judge, had improperly communicated orally with the jury during their deliberations and that

order for a new trial was affirmed. The appellate court stated:

> Granting a new trial for misconduct or indiscretion on the part of jurors, lawyers, and a trial judge, occurring prior to the rendition of a verdict, rests largely within the discretion of a trial court.

*Id.* at 461.

The majority places heavy reliance upon *Iverson v. Pacific American Fisheries*, 73 Wash.2d 973, 442 P.2d 243 (1968). *Iverson* is also a far cry from the case at bar. There, after retiring to consider a verdict, a jury became deadlocked at nine to three for the defendant. They so advised the trial judge and he returned the jury into open court and gave them the Washington "dynamite" instruction (presumably in the presence of counsel). They were returned to the jury room and ten minutes later returned with an eleven to one defense verdict. An application for new trial was made and granted by the trial judge, who stated:

> I think, considering the length of time that this jury deliberated, and considering the jury's note to me—which did reveal the majority and minority opinion—and considering what they did after I read WPI–1, these things convinced me that the jury felt they were being ordered by the Court to reach a verdict, and without regard to what their honest conviction might be, and that the minority was being ordered to capitulate.

*Id.* at 244.

I believe the clear message of the authorities is that problems of communications during the time of jury deliberations are, in the first instance, for resolution by the trial judge in the sound exercise of his discretion. Here the trial judge was given no opportunity to so exercise his discretion by a motion for a new trial. The majority opinion in large part bases its reversal on speculation as to what the jury might have considered in their deliberations regarding a partial as contrasted with a complete taking. My reading of the record does not disclose that such was the subject issue at trial, was not the subject of any of defendant's re-

quested instructions nor was it the focus of appellant's assignments of error or argument upon appeal.

DONALDSON, J., concurs.

## ON DENIAL OF PETITION FOR REHEARING

Bistline, Justice.

In petitioning for a rehearing the Rueths strenuously urge that the Court improperly required of them that they show that the *ex parte* unrecorded communications between the trial judge and the jury were harmless. That assignment has been given full consideration, and we remain of the opinion that the rule applied was the correct one in view of the factual situation of this particular case. Since the announcement of the opinions in this case the Supreme Court of the United States has had occasion to pass upon the same question. *United Stated v. United States Gypsum Company, et al.,* 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). At the request of the Court both parties have filed briefs addressing the relevancy and persuasion of that case to the one before us. The defendant, State of Idaho, has also taken advantage of the opportunity afforded it to fully respond to the contentions of the Rueths which were advanced in their petition for rehearing and supporting briefs. While not controlling, we find the language of the United States Supreme Court in the *Gypsum* case to be supportive of our earlier conclusion to follow and apply *State v. Bland, supra,* and briefly state the views of that court as to *ex parte* discussions or communications of judge and jury:

> Any *ex parte* meeting or communication between the judge and the foreman of a deliberating jury is pregnant with possibilities for error. . . . Unexpected questions or comments can generate unintended and misleading impressions of the judge's subjective personal views which have no place in his instruction to the jury—all the more so when counsel are not present to challenge the statements. Second, any occasion which leads to communication with the whole jury panel through one juror inevitably risks innocent misstatements of the law and

> misinterpretations despite the undisputed good faith of the participants. Here, there developed a set of circumstances in which it can fairly be assumed that the foreman undertook to restate to his fellow jurors what he understood the judge to have implied regarding the resolution of the case in a definite verdict "one way or the other." There is of course, no way to determine precisely what the foreman said when he returned to the jury room.

> Finally, the absence of counsel from the meeting and the unavailability of a transcript or full report of the meeting aggravate the problems of having one juror serve as a conduit for communicating instructions to the whole panel. . . Counsel were thus denied any opportunity to clear up the confusion regarding the judge's direction to the foreman, which could readily have been accomplished by requesting that the whole jury be called into the courtroom for a clarifying instruction. See *Rogers v. United States,* 422 U.S. 35, 38, 95 S.Ct. 2091, 2094, 45 L.Ed.2d 1; *Fillippon v. Albion Vein State Co.,* 250 U.S. 76, 81, 39 S.Ct. 435, 436, 63 L.Ed. 853 (1919).

98 S.Ct. at 2885–2886.

As pointed out in the special concurrence of Justice Bakes, the *Rueth* jury was apparently of the thought that it needed some enlightenment as to the nature of the ownership which would remain with the Rueths after the assessment of damages. Obviously, the apparent confusion might have been absent had the trial judge instructed the jury as to the nature of the servitude or easement which the State had taken from the Rueths. Mr. Rueth testified that the "after" value of the property was but $15,000, which he said might be obtainable from the salvage of the buildings. Mrs. Rueth testified to a similar figure, $15,000 to $18,000—also based on salvage. Mr. Rueth stated that the value of the property, including improvements, prior to its becoming "wet" in 1972 was $120,000 to $125,000. It is not inconceivable that the jury, in awarding compensation of $127,000, with due regard to the salvage testimony, concluded

that the taking by the State was of the entire use of the property, thus raising the question in the mind of the jury as to ownership, leaving it to speculate, perhaps, that the awarding of compensation for such a complete taking would have the result of vesting the fee title in the State and leaving in doubt as to whom the salvage would belong. Given instruction No. 2 informed the jury that it could find a taking if it determined that the State's structure caused water to back up and stand upon Rueth's lands, and that by virtue thereof the property, or some portion of it, was permanently damaged. Although the nature and extent of the easement or servitude was not covered in the instructions, the jury was further by given instructions Nos. 4 and 5 instructed that if it found a taking, it would have to find valuations immediately before and immediately after the damage was inflicted, and that the measure of compensation for the taking of Rueth's property was "the difference between the fair market value of plaintiffs' property before the take and the fair market value of plaintiffs' property immediately after the taking." Somewhat contradictory, certain language in given instruction No. 4 also directed the jury in setting values to be concerned with, as "key dates," the summer of 1971, before the backing up of water, and "the time of trial."

Rueths argue, and the State concedes, that the State is not in a position to raise any challenge to the given instructions, having registered no objections as was then required by then fluctuating Rule 51 which, as made effective January 1, 1975, and hence governing this October of 1975 trial, required the making of objections, whereas the rule had formerly read otherwise (being again changed back to the pre-1975 version by order of the Court entered in July of 1976).

Nevertheless, an assignment of error made by the State, and not dealt with in the earlier opinion, was the failure of the trial court to grant the State's motion for a bifurcation of the trial, with the trial court requested to determine whether there had been a taking and, if so, the nature thereof,

leaving the issue of damages for trial to a jury. The Rueths, in seeking a rehearing, have rather heavily emphasized the Court's failure to pass upon this assignment, pointing out that absent the resolution of this issue, a second trial of this case may result in a second appeal should the trial court again leave the resolution of the taking issue for jury determination, as the Rueths continue to contend to be the state of the law and as was done in the first trial. The Rueths admit that the issue has never been squarely before the Court, although they say that it was given indirect consideration in *Mabe v. State*, 83 Idaho 222, 360 P.2d 799 (1961), and again in *Turcotte v. State*, 84 Idaho 451, 373 P.2d 569 (1962). For other authority supportive of their position they cite the Oregon case of *Thornburg v. Port of Portland*, 233 Or. 178, 376 P.2d 100 (1962), which they urge upon us as a leading case.

In *Mabe*, contrary to Rueth's reading of the case for the proposition that the cause there was remanded for a jury trial on the taking issue, the Court merely reversed a summary judgment dismissal of the action and directed its reinstatement. It is true, as Rueths say, that the introductory remarks of that opinion disclose that the action was in inverse condemnation, with the Mabes contending that their amended complaint and supporting affidavit set forth facts sufficient in law to entitle them to damages in some amount, with the further remarks of the Court that the Mabes as a corollary thereof asserted error in being denied a jury trial on the issue of the extent of access impairment and damages. The holding of the case was only that summary judgment had been improperly granted. Justice McFadden, who authored that opinion, also authored the later opinion in *State ex rel. Flandro v. Seddon*, 94 Idaho 940, 500 P.2d 841 (1972), a case heavily relied upon by the State, concerning which more will hereinafter be said. *Mabe* does not support the Rueths.

As to *Turcotte, supra*, Rueths state that the landowners, unsuccessful in their attempt for compensation in a jury trial, on

appeal argued in this Court that the jury should not have been given the issue of whether there had been a taking, adding that this Court suggested in that case its approval of the submission of the taking issue to the jury, but also Rueths pointed out that this Court there noted that, in any event, appellants did not object to its submission and offered instructions as to what constitutes a "taking" of private property. There is bothersome language in *Turcotte*, and such case may very well have been the authority supplied to the trial court in this action which led to the denial of the motion for bifurcation. If so, any fault in denying the motion is attributable not to the trial judge, but to that language in *Turcotte, supra*, where the Court wrote:

> Appellants argue that the question of whether there has been a taking is not a matter for jury determination. This contention is without merit. Appellants liken the question of whether there has been a "taking" to the proceedings in the normal condemnation action where the determination as to whether the proposed use is authorized by law and if the taking is necessary for such use are judicial questions. Although actions of this kind are based on the theory of inverse condemnation the issues are not identical with proceedings in eminent domain.
>
> In determining the question of whether parties are entitled to a trial by jury, courts must look to the ultimate and entire relief sought. *Johansen v. Looney*, 30 Idaho 123, 163 P. 303; *Cleland v. McLaurin*, 40 Idaho 371, 232 P. 571; *Cooper v. Wesco Builders*, 76 Idaho 278, 281 P.2d 669. Therefore, in determining this contention the court must be guided by the averments of appellants' complaint and the body or substance of the relief they are seeking. The relief here prayed for is damages.

84 Idaho at 455, 373 P.2d at 571.

In reviewing the *Turcotte* opinion we observe that the appellants there did not, as here, preserve the question for appeal, but as candidly pointed out by Rueths and as set forth in the opinion, "made no objection to the submission of the question of a tak-

ing to the jury," and "submitted requested instructions as to what constituted a 'taking' of their property which were intended to guide the jury in determining such issue." We rule today that that portion of *Turcotte* above set forth was not necessary to the decision of the case, and that the holding of that case was that appellants, making no objection, and on the contrary, acquiescing and participating in the submission of the taking issue to the jury, were in no position to complain on appeal.

In the present case, as mentioned, the State made a proper motion for bifurcation, asking the trial court to rule that the taking issue was a question for the court, not for the jury. On gaining an adverse ruling, the State cannot be faulted for thereafter submitting instructions which attempted to explain to a lay jury the factors which it would consider in trying to decide whether or not the State by its conduct had appropriated from the Rueths their property or some interest therein.

As was stated by the Oregon Supreme Court in *Thornburg, supra*, mentioned above as a case relied upon by Rueths:

> The idea that must be expressed to the jury is that before the plaintiff may recover for a taking of his property he must show by the necessary proof that the activities of the government are unreasonably interfering with his use of his property, and in so substantial a way as to deprive him of the practical enjoyment of his land. This loss must then be translated factually by the jury into a reduction in the market value of the land.

376 P.2d at 110.

The Oregon court apparently recognized the difficulty attendant to submitting such an issue to a jury, saying that "In submitting to a jury a case such as we have before us, the trial court is confronted with the need to verbalize rules as abstract as any to be found in the law, but, a we have said before, the ingenuity of trial judges in formulating meaningful instructions to juries is usually equal to the task." *Id.* at 110. To our mind, the rationale of that state-

ment fails to consider that trial courts in turn look to the attorneys for instructions, and complex questions of law, and mixed law and fact are then to be resolved by laymen, who in turn hopefully are capable of comprehending instructions on a subject which that Supreme Court had, at least at that time, not deigned to address.[1] The Oregon Court stated that the Oregon constitution places the duty of resolving the taking issue upon the jury, but having read that state's applicable constitutional provision,[2] we fail to see, nor need we, how that Court arrived at the conclusion that the resolution of such a complex issue was a jury question.

The Rueths urge upon us that we observe a distinction between "ordinary condemnation actions," and "inverse condemnation actions." This we cannot do, other than to observe that the distinction, if such it may be truly called, is that the ordinary proceeding in eminent domain is instituted by the party claiming the right to exercise that power, whereas an inverse proceeding is instituted by a property owner who asserts that his property, or some interest therein, has been invaded or appropriated to the extent of a taking, but without due process of law, without payment of just compensation, and thus in violation of the Idaho Constitution.

In *Renninger v. State*, 70 Idaho 170, 213 P.2d 911 (1950) the Court stated tersely but accurately that that action, which sought damages for the permanent although intermittent flooding of the property owners' lands, was in essence "a condemnation suit in reverse." *Id.* at 177, 213 P.2d 911. The final paragraph of that opinion said this: "Because this is, in effect, a condemnation suit and the condemnor must bear all costs, costs are awarded [to] appellants." *Id.* at 179, 213 P.2d at 917. It is clear that the Court there considered that what is now popularly called an action in inverse condemnation is nevertheless a proceeding in eminent domain and the only difference is the reversed alignment of the parties. The Court there noted that "Article 1, Section 14 of the Constitution of Idaho, is mandatory that private property may not be taken until a just compensation, to be ascertained in the manner prescribed by law, is paid." *Id.* at 177, 213 P.2d at 915. The Court there reiterated what an earlier Court had said in *Bassett v. Swenson*, 51 Idaho 256, 5 P.2d 722 (1931), that this constitutional provision is self-executing, that is, " 'No action of the Legislature further than providing the procedural machinery by which the right may be applied is necessary.' " *Id.*, 70 Idaho at 177, 213 P.2d at 915. The import of that holding is clear. Both the right to condemn and the right of the condemnee to just compensation are granted, not by the legislature, but by the Constitution. The Court in *Renninger, supra*, repeated the holding from *Bassett, supra*, that " 'whether or not a right claimed under this provision of the Constitution is within the grant *is held to be a judicial question to be determined by the courts.*' " *Id.* at 177, 213 P.2d at 915. In the ordinary situation the constitutional right to condemn is exercised by the party seeking to take private property. In the "reverse" situation the constitutional right to be paid just compensation is exercised by the property owner who brings the action,

1. Counsel did not bring to our attention that *Thornburg, supra*, after retrial was appealed a second time and reversed a second time. It seems that trial judge's ingenuity resulted in giving instructions on the taking issue which were too abstract. *Thornburg v. Port of Portland*, 244 Or. 69, 415 P.2d 750, 752.

2. The Oregon Constitutional provision on eminent domain proceedings is similar to our own. Art. I, § 18 provides:

Private property shall not be taken for public use, nor the particular services of any man be demanded, without just compensation; nor except in the case of the state, without such compensation first assessed and tendered; provided, that the use of all roads, ways and waterways necessary to promote the transportation of the raw products of mine or farm or forest or water for beneficial use or drainage is necessary to the development and welfare of the state and is declared a public use.

The Oregon Court's holding may be based upon that provision of the constitution preserving the right of jury trial. Art. I, § 17 reads that "In all civil cases the right of Trial by Jury shall remain inviolate."

alleging that his property rights have been taken without payment.

Wherein *Renninger* went beyond any of the earlier cases was its holding that the constitutional provision guaranteeing to property owners the ascertainment *and payment* of just compensation before private property could be taken for a public use constituted a waiver of the State's immunity from suit. *Id.* at 178, 213 P.2d 911. From that point the Court went on to hold that "if the State takes the property without condemning, the landowner, to give full force and effect to the provision of the Constitution as self-executing, must be entitled to sue therefor, * * * " *Id.* at 178, 213 P.2d at 916. Many authorities from other states were cited for the foregoing proposition, of which *Rose v. State*, 19 Cal.2d 713, 123 P.2d 505 (1942) we deem most significant. That case has remained a leading case in California jurisprudence.

In *Rose* the California Supreme Court used language surprisingly like that eleven years earlier used by the Idaho Court in *Bassett.* After stating the provision of Section 14 of Article I of the California Constitution that "Private property shall not be taken or damaged for public use without just compensation having first been made to, or paid into court for, the owner . . ;" that court went on to say:

> Since article I, section 14, therefore, is a restriction placed by the Constitution upon the State itself, and upon all of its agencies who derive from it their power of eminent domain, it cannot be said that the mere failure of the legislature to enact a statute allowing suit to be brought against the state entitles the state to disregard and violate that limitation. The logical inference is that said constitutional provision is intended to be self-enforcing.

123 P.2d at 510.

Not specifically mentioned in *Renninger*, but inferentially before that Court was another California Supreme Court case which followed *Rose* by a scant year, *People v. Ricciardi*, 23 Cal.2d 390, 144 P.2d 799 (1942), in which case that court specifically ob-

served that although there are two forms of action by which the property owner may obtain his guaranteed constitutional right of just compensation for the taking or damaging of his private property, "the result is the same in that in each the property owner receives compensation for invasion of his private right." *Id.*, 144 P.2d at 804. Applicable here, the court there stated:

> In the one case the property owner assumes the burden of alleging and proving his property right and the infringement thereof, and the question whether his allegations in that behalf are sufficient may be determined on demurrer. In the other case the condemning authority, in commencing the proceeding, affirmatively alleges ownership in the defendants, the contemplated taking and severance, and seeks a determination by the court of issues confided by the law to the decision of the court and also seeks a determination by the jury, unless one be waived, of the compensation which should be paid to the property owner.

. . . . .

> When the proceeding comes on for hearing *all issues except the sole issue relating to compensation are to be tried by the court,* and if the court does not make special findings on those issues its findings thereon are implicit in the verdict awarding compensation. *Vallejo, etc., R. Co. v. Reed Orchard Co.*, 169 Cal. 545, 556, 147 P. 238; *City of Oakland v. Pacific Coast Lumber, etc., Co.*, supra, 171 Cal. 392, at page 397, 153 P. 705. In the *Vallejo* case, 169 Cal. at page 556, 147 P. at page 244, the court said: "*A condemnation suit is a special proceeding. It is not included in the classes mentioned in section 592 [Code of Civil Procedure] in which a jury is required.* That section is expressly made applicable to condemnation suits. Code Civ.Proc. § 1256. It follows that, *except those relating to compensation, the issues of fact in a condemnation suit, are to be tried by the court,* and that if the court submits them to a jury, it is nevertheless required to make findings either by adopting the ver-

dict thereon or by making findings in its own language." In the Oakland case the point was urged that the question whether the parcels of land involved constituted one parcel within the meaning of section 1248 of the Code of Civil Procedure must be submitted to the jury for determination. The court said at page 397 of 171 Cal., at page 707 of 153 P.: "But neither the state nor any of its mandatories nor any other person or corporation exercising the power of eminent domain, is compelled to submit to the determination of a jury every question of fact. (*Vallejo, etc., R. Co. v. Reed Orchard Co.* [169 Cal. 545], 147 P. 238), and this question of fact (namely, whether or not, the probative facts being without controversy, the resultant fact establishes the existence of a parcel from which a portion is to be taken) is essentially a question of law for the determination of the court. *It is only the 'compensation,' the 'award,' which our Constitution declares shall be found and fixed by a jury. All other questions of fact, or of mixed fact and law, are to be tried as in many other jurisdictions they are tried, without reference to a jury.* Const., art. I, § 14." The law declared in these two cases has been followed in this state without deviation.

*It was therefore within the province of the trial court and not the jury to pass upon the question whether under the facts presented, the defendants' right of access will be substantially impaired.* If it will be so impaired the extent of the impairment is for the jury to determine.

This is but another way of saying that the trial court and not the jury must decide whether in the particular case there will be an actionable interference with the defendants' right of access. This the trial court did when it ruled on the admission of evidence and in its instructions to the jury. (Emphasis added) *Id.*, at 804–806.

Fifteen years later the California Supreme Court in *People v. Russell*, 48 Cal.2d 189, 309 P.2d 10 (1957) cited *Ricciardi*, and affirmed its holding: "In an eminent domain proceeding the amount of compensation is to be determined by the jury. Const. Art. I, § 14. All other issues are to be tried by the court, and if it does not make special findings on those issues they are implicit in the verdict awarding compensation." 309 P.2d at 14.

An examination of the file in *Turcotte, supra*, discloses that neither *Ricciardi, supra*, nor *Rose, supra*, were cited in the briefs of the parties. More than that, neither party cited any authority for or against the proposition that only the assessment of compensation may properly be submitted to the jury in an eminent domain proceeding. Specifically, the State there did not contend that the appellant was incorrect in arguing that all issues other than compensation were to be resolved by the court, but argued instead that the appellant property owner had not presented that theory to the trial court in the first instance.[3]

In *Flandro, supra*, Justice McFadden authored a unanimous opinion which, other

**3.** Counsel for the property owner did at the close of the case move the trial court to rule as a matter of law that there had been a taking, and also submitted a requested instruction which, had it been given, would have told the jury that there had been a taking "as a matter of law, and that the only remaining question for you to determine is the amount of damages which should be paid to the plaintiffs for the part so taken and for damages to the remainder of their property." The instruction was not given, and the trial court denied the motion for a ruling that there had been a taking without allowing any argument. On the appeal the State's argument was that the property owners' trial motion was not that the resolution of the taking issue was improper for the jury, but

that the evidence showed no conflict, and the owner was as a matter of law therefore entitled to a directed verdict on liability, as is so in ordinary civil cases. The State there argued that if the owner contended that the resolution of the taking issue was for the court, and not the jury, "why did he not at least attempt to arrange for such trial to the court? Why did he not at least suggest that the question of taking should be set on the court's calendar for a certain time and the question of damages to be tried to the jury sometime subsequent to the issue of law. . . . The pre-trial conference is the logical place for raising that question. Appellant did not even intimate there that whether a taking had occurred should be tried to the court."

than for the unfortunate language in *Turcotte*, should have put to rest any thought that a jury will resolve any issue but that of just compensation:

> An eminent domain proceeding is not an ordinary "civil" action wherein the factual issues are submitted to a jury for determination. Historically, eminent domain action was ex parte and inquisitorial in the common law and has not been regarded as a civil remedy. Nichols on Eminent Domain, §§ 1.1–1.44 (3d rev. ed.). The power of eminent domain arises as an incident to sovereignty of the state with this authority recognized by the state constitution. Idaho Const. art. 1, § 14; *Portneuf Irrig. Co., Ltd. v. Budge*, 16 Idaho 116, 100 P. 1046 (1909). The procedures for eminent domain actions have been established by the legislature. Idaho Code, Title 7, Ch. 7. Because eminent domain authority arises from an inherent sovereignty of the state to take property for its own use, such proceedings do not come within the scope of Idaho Const. Art. 1, § 7, pertaining to trial by jury. *Portneuf Irrig. Co. v. Budge, supra.* Although I.C. § 10–105 requires trial by jury of factual issues in enumerated classes of actions, no reference is made therein to eminent domain proceedings. *Consequently in eminent domain proceedings the only issue for submission to a jury is the question of the value of the property sought to be taken or the amount of compensation for the taking.* I.C. § 7–711. *See People v. Ricciardi*, 23 Cal.2d 390, 144 P.2d 799 (1944); *People ex rel. Dept. of Public Works v. Russell*, 48 Cal.2d 189, 309 P.2d 10 (1957). Other factual issues should be resolved by the trial court. (Emphasis added)

94 Idaho at 943, 500 P.2d at 844.

The California cases of *Ricciardi, supra, Rose, supra,* and *Russell, supra,* were followed by the California Supreme Court in *Breidert v. Southern Pacific Company*, 61

Cal.2d 659, 394 P.2d 719 (1964) in which inverse condemnation case,[4] that court said:

The determination of whether such substantial impairment has been established must be reached as a matter of law. The extent of such impairment must be fixed as a matter of fact. The cases have consistently held that the trial court must rule, as a matter of law, whether the interference with access constitutes a substantial or unreasonable impairment. Thus in *People v. Ricciardi*, supra, 23 Cal.2d 390, 402–403, 144 P.2d 799, 805–806, we said: "It was * * * within the province of the trial court and not the jury to pass upon the question whether under the facts presented, the defendants' right of access will be substantially impaired. If it will be so impaired the extent of the impairment is for the jury to determine. This is but another way of saying that the trial court and not the jury must decide whether in the particular case there will be an actionable interference with the defendants' right of access."

394 P.2d at 722.

In a Kansas case brought to our attention in the State's brief, complaint on appeal was made to the trial court leaving for jury determination the question of a taking. The Supreme Court states its agreement with the following legal premise advanced by the property owner:

" * * * that it was highly prejudicial and clearly error to let the jury decide if there had been a taking. If the appellants did not establish a taking of access rights, there should have been no question whatsoever for the jury to decide. As in any other condemnation case, whether there is a taking of a property right is a question of law, and must be decided by the court. * * * "

*Brock v. State Highway Commission*, 195 Kan. 361, 404 P.2d 934, 940 (Kan.1965). The Kansas court went on to say:

---

4. In footnote 1 the *Breidert* court stated:

 "An inverse condemnation action is an eminent domain proceeding initiated by the property owner rather than the condemnor. The principles which affect the parties' rights

in an inverse condemnation suit are the same as those in an eminent domain action. (See *Rose v. State of California*, supra, 19 Cal.2d 713, 123 P.2d 505; *Bacich v. Board of Control*, supra, 23 Cal.2d 343, 144 P.2d 818.)"

The appellee contended that it had the right under the police power to limit or control appellants' access as it did. Whether or not a governmental agency has exceeded its police power and taken private property for public use is a question of law for the determination of the court under the existing facts and circumstances of the particular case. Not until the trial court determines that private property has been taken for public use is the question of the amount of damages ripe for the determination of a jury.

In all condemnation cases the only question presented for the jury's determination is the loss to the owner because of the property taken. The fact that there was a taking has been previously determined by the court.

An action to recover damages for the taking of private property for public use is in the nature of an inverse condemnation proceeding. The same rules of law apply to the determination of the right to damages and the measure of damages as in a condemnation proceeding.

*Id.*, at 940.

Citing the early case of *Stuart v. Colorado Eastern Ry. Co.*, 61 Colo. 58, 156 P. 152 (1916) the Colorado Supreme Court stated that:

[A]n inverse condemnation action is in the nature of a special statutory proceeding and is to be tried as if it were an eminent domain proceeding.

*Ossman v. Mountain States Telephone & Tel. Co.*, 184 Colo. 360, 520 P.2d 738, 742 (1974).

The earlier Colorado case, *Stuart, supra,* a forerunner in the field, stated the proposition simply:

Whether, technically speaking, the defendant has a vested title now to the right of way before paying for it—in view of our Constitution, which provides that no title shall vest until payment has been made for the land taken—is immaterial in the present case. The pleadings and admissions disclose that the right of way has been taken without payment

therefor by either the defendant or its predecessor, that it still retains the land, is using and refuses to pay for it, and the purpose and object of this action is to compel payment. *The suit, though brought by the owner, under such circumstances is to compel or force condemnation. It is to be tried like a condemnation suit,* and plaintiff will have the opening and closing. The taking and the necessity for the taking being admitted, the only issue remaining to be tried is the value of the land taken and the damages occasioned by the taking. The defenses that the cause of action accrued to another and the plea of the statute of limitations are res judicata under the pleadings and will not be considered by the court.

The judgment of the lower court is reversed, and the cause remanded, with directions to overrule the motion for judgment on the pleadings, *to treat the case as an action brought* by plaintiff to compel condemnation and payment *under the laws of eminent domain,* . . . (Emphasis added)

*Stuart v. Colorado Eastern Ry. Co.*, 156 P. at 156.

A general statement of propositions of law attendant to procedures is found in the text Corpus Juris Secundum:

" . . . the owner of property appropriated for a public purpose without compensation having been made may demand and recover the value of the property taken. Such an action is sometimes treated as a condemnation proceeding and is designated as a proceeding in reverse or inverse condemnation. The fact that the action is brought by the owner rather than the condemnor does not change its essential nature. The action is not based on tort, but on the constitutional prohibition of the taking of property without just compensation."

30 C.J.S. *Eminent Domain* § 399.

Citing the foregoing authority the Court in *State ex rel. Symms v. Nelson Sand and Gravel, Inc.,* 93 Idaho 574, 468 P.2d 306 (1970), stated:

The state did not attempt to appropriate the leased tract until April 2, 1968 at which time the state advised the respondent that it could no longer mine gravel in the area of the new interstate highway. At this time the respondent had become the lessee of the mineral rights in tract C by assignment of the lease from the Nelsons. As owner of the leasehold interest at the time of the taking, the respondent was entitled to any award of damages for the appropriation.

Although no formal condemnation action was ever instituted against tract C, the respondent's counterclaim for damages for the taking of the leasehold interest is in the nature of an inverse condemnation. In *Renninger v. State*, 70 Idaho 170, 213 P.2d 911 (1950), this court recognized the validity of an inverse condemnation action by which a property owner institutes an action against the state to recover just compensation for an appropriation of land when the state has taken an interest in land and refused to institute eminent domain proceedings to determine the amount of just compensation.

A cause of action for inverse condemnation arises at the time of actual interference by the condemnor with the owner's right to use the property. 30 C.J.S. Eminent Domain § 399 pp. 475–480. At the time of such interference in the present case, the respondent was the owner of the leasehold interest and was therefore the proper party to institute inverse condemnation proceedings which it did by means of the counterclaim interposed here. The appellant's contention that the respondent is not entitled to damages for the condemnation of the leasehold because it was not the owner at the time of condemnation is, therefore, without merit.

*Id.*, at 579, 468 P.2d at 311.

Here, then, is an Idaho case where the property owner's inverse condemnation claim was filed as a counterclaim, and then *tried as an eminent domain proceeding* along with the main action which had been initiated by the State. It also appears that the Court there adhered to I.C. § 7–711 by submitting interrogatories to the jury in the proceeding initiated by the owner as well as in that commenced by the State.

Holding as we do that this cause be retried as a proceeding in eminent domain, we do not perceive that other issues raised on the appeal will cause any further problem, and hence need not be discussed.

 Our holding today is simply to reaffirm what was said in *Flandro, supra*. An eminent domain proceeding is *not* an ordinary civil action. Art. I, § 14 of the Idaho Constitution allows the right of eminent domain only where there has been the ascertainment and payment of just compensation, and the same constitutional provision provides the right in a property owner to initiate the eminent domain proceeding where he alleges that his private property has been taken without ascertainment of just compensation followed by payment. The eminent domain proceeding is founded in the constitution, and whether the proceeding is initiated by the party seeking to condemn, or by the property owner who claims his property or rights therein have been taken, it is not an ordinary civil proceeding. Hence in either case all issues, other than just compensation, are for resolution by the trial court.

In holding that only the issue of just compensation is properly resolved by a jury, we are not to be understood as saying that a bifurcated trial of issues is always necessary. Conceivably, in the interests of economy, and depending on the particular circumstances of each case, as may be unfolded in pre-trial discovery, or at pre-trial conference, the trial court may determine to impanel a jury and have all issues presented at one time. In any event, however, the trial court will make the determination of the taking issue which will be reflected, as in California, in instructions which advise the jury that there has been a taking, and the nature of the property right taken where the court concludes that the taking is less than the fee. Additionally, and as appears to be the practice in California, it is desirable that the trial court enter findings

and conclusions pertinent to that issue, and pertinent to any issue other than that of just compensation. As is the case where a trial court in an ordinary civil action tried without a jury decides the case on its merits on a defendant's motion for an involuntary dismissal at the close of plaintiff's case, the court may properly express his ruling orally, and make findings and conclusions at a later and more convenient time—thus being able to continue the trial in instances where value testimony has not yet been offered, or to submit the matter of just compensation to the jury if the entire case is in before the court elects to rule on the taking issue.

We note that in *United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), an inverse condemnation case appealed from the United States Court of Claims, the Supreme Court declined to pass upon the propriety of the amount of the award without proper findings from the Court of Claims as to the nature of the easement, saying that "An accurate description of the property taken is essential, since that interest vests in the United States. *United States v. Cress,* 243 U.S. 328, 329, 37 S.Ct. 385, 386, 61 L.Ed. 746 and cases cited." 328 U.S. at 267, 66 S.Ct. at 1069.

In close cases, the trial courts may conclude it to be preferable to bifurcate the issues, with the court upon determining the taking issue then providing an accurate description of the property or right therein which has been taken. Such a procedure would save litigants the unnecessary expense of expert witness fees and trial time were all issues submitted in one trial and the taking issue then resolved adversely to the property owner.

Taking note that the jury in this case, to whose judgment the taking issue was submitted, albeit erroneously, found an invasion of the Rueths' property rights by the actions of the State, with which the trial court of his own volition did not evidence any disagreement, and consistent with the holding that the only issue for jury resolution is that of just compensation, we do not award the State any costs on this appeal.

The petition for rehearing is denied and the cause is remanded to the district court for further proceedings consonant with this Court's opinion. No costs allowed. *Bassett v. Swenson, supra.*

McFADDEN and BAKES, JJ., concur.

SHEPARD, C. J., and DONALDSON, J., would grant a rehearing and continue to adhere to the views expressed in the dissent.