687 P.2d 570

STATE of Idaho, Plaintiff-Respondent,

v.

Randy Lynn McKINNEY, Defendant-Appellant.

No. 14551.

Supreme Court of Idaho.

July 26, 1984.

Rehearing Denied Sept. 25, 1984.

Edward W. Pike, Idaho Falls, for defendant-appellant.

**182**

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., Boise, for plaintiff-respondent.

SHEPARD, Justice.

This is an appeal by McKinney from his convictions of first degree murder, conspiracy to commit murder, robbery, conspiracy to commit robbery, and the sentence of death imposed upon him. We affirm.

The circumstances surrounding the offense are reviewed at length due to the allegations of error and the imposition of the death sentence. McKinney and his female companion, Dovey Small [who was also separately tried and convicted and whose appeal is also pending before this Court] were traveling from California through Idaho, planning to hitchhike to Montana or Canada. McKinney carried with him a .22 caliber revolver. While the pair were in Malad, Idaho, they were joined by Small's sisters, Ada and Kathy, where McKinney showed his gun and indicated he had entered the "big time." The group traveled to Blackfoot, where Ada called Bob Bishop (a stranger to McKinney and Small), who agreed to transport McKinney and Small to the interstate highway where they could continue their hitchhiking journey. McKinney stated to Kathy, "I'm going to blow him [Bishop] away." When Bishop arrived, Kathy warned him about McKinney and his gun, and indicated that he [Bishop] might get hurt. With a group in Bishop's car, McKinney, seated in the rear, pointed his index finger at Bishop as if it were a gun.

At a later time, out of Bishop's hearing, Dovey Small stated that Bishop had a lot of money and that she and McKinney were going to kill him for some money because they had to leave Idaho. At a still later time, Small and McKinney discussed killing Bishop and taking his car, money, and credit cards. Dovey Small attempted to get one Wheeless to kill Bishop, and, when he refused, McKinney asked Wheeless to recommend a good place for the killing, which Wheeless also refused. McKinney then stated that he would "just take him out on the desert and shoot him and throw some

bushes over him and just burn him so they can't trace him ...." Dovey Small agreed and urged that they get it over with quickly.

Bishop drove Dovey Small, Ada, and McKinney to Moore, Idaho, where Dovey Small and Ada remained. McKinney and Bishop drove to an abandoned gravel pit, presumably for target practice. While Bishop set up targets, McKinney shot him through the arm and chest. Then McKinney walked to Bishop and placed four more shots in the back of Bishop's head. McKinney then returned to Moore and picked up Ada and Dovey Small. When Ada asked for Bishop, McKinney replied that he had shot him in the stomach and five times in the head. When Ada expressed disbelief, McKinney took them to the site and showed them the body of Bishop. Ada was then taken to her home in Blackfoot. Small and McKinney then drove to Kathy's house, where Dovey Small stated that McKinney had shot Bishop. Small and McKinney next drove to Pocatello, Idaho and bought some gas with Bishop's credit card. They then called Ada to inform her that they were returning to her home, at which point the police were called. When the police arrived at Ada's home indicating they had a report that there had been a shooting, Ada told the officers that she saw Bishop's body, that she knew where it was, that McKinney had killed him, that there was a weapon, and that the weapon was in the car driven by McKinney.

When Small and McKinney returned to Ada's house, two police cars followed the vehicle. When McKinney exited the car, McKinney was required to raise his arms, and Officer Frew approached McKinney, conducted a weapons search of McKinney's person, and asked him if he had shot anybody. McKinney said he had not, at which point Frew asked McKinney if he had a gun. McKinney answered, "Yes, it's in the car. Go ahead and get it if you want." Frew left the scene momentarily and McKinney entered Ada's trailer house.

McKinney asked Ada, "What did you say?" and Ada's husband replied, "What

the hell do you think she said? She told the truth." McKinney responded, "Well, it looks like I'm going for murder." At that point, the officers knocked and were admitted, where they witnessed a heated argument between McKinney and Ada's husband. Ada said, "Randy shot Bob Bishop." McKinney responded, "I didn't shoot anybody." McKinney complied with Frew's request to go outside, where Frew indicated to McKinney the desirability of getting McKinney out of the area and into jail in "protective custody." McKinney agreed that such would be desirable.

The doors of the vehicle driven by McKinney had been left open and the officers looking in the car saw a purse with a handgun sticking out, a light brown wallet, and several other items. Frew inspected the wallet and found Bishop's credit cards and identification. When the handgun was removed from the purse, the smell indicated it had been recently fired. All items were then replaced in the car, which was locked and sealed, and a warrant obtained.

Frew drove McKinney to the Blackfoot jail, and during the trip McKinney was read his rights from a *Miranda* card, but told that Frew did not want to take any statement from him at that time. The next day shortly after noon, three officers met with McKinney and indicated they were investigating a possible shooting. McKinney was read the *Miranda* warnings off a *Miranda* card, at which point it was discovered that the officers did not have the written form for the signature of the person being questioned. In answer to a question, "Having these rights in mind, do you wish to talk to us now," McKinney stated that he did so desire to talk. McKinney was asked what he had done during the preceding day, and he stated that he and some friends had gone to Pocatello. He was asked if he was mistaken and meant Arco, to which McKinney responded, "No, I've never been to Arco."

At this point, a printed waiver form had been found, and it was given to McKinney, who read it, initialed each provision, and then signed the form. McKinney was then confronted with the fact that others had told of the events of the previous day, and he was asked if he would tell the whole truth. McKinney then gave a verbal and a written statement to the officers, which included that the shooting was accidental, that McKinney did not remember many of the events, and that, when McKinney returned to the site of the shooting, neither of the women exited the car.

McKinney was arraigned that afternoon and subsequently tried and convicted of first degree murder, conspiracy to commit murder, robbery, and conspiracy to commit robbery. He was sentenced to death for the first degree murder conviction.

█ McKinney first argues that the trial court incorrectly failed to suppress the evidence of McKinney's handgun and Bishop's wallet and credit cards. McKinney has no standing to object to the evidence seized in the car of the victim. The car was admittedly the property of the victim Bishop, and the officers had a duty to investigate the murder of Bishop and investigate the victim's property for evidence connected with the crime. Further, the evidence seized "was in the plain view of the officers where they were in a place where they had a right and duty to be." *State v. Pontier,* 95 Idaho 707, 712, 518 P.2d 969, 974 (1974); *see also State v. Smith,* 102 Idaho 108, 626 P.2d 206 (1981); *State v. Ellis,* 99 Idaho 606, 586 P.2d 1050 (1978).

█ McKinney next asserts error in the admission of oral statements made by him at Ada's home on April 8, 1981. The first statement was in response to the officer's initial contact with McKinney inquiring whether he had shot anyone, to which he answered, "No." At that point, the investigation into Bishop's murder had not yet focused on any suspect, and for that matter the officers had no certain evidence that a crime had been committed. *State v. Wyman,* 97 Idaho 486, 547 P.2d 531 (1976); *State v. McClellan,* 96 Idaho 569, 532 P.2d 574 (1975); *see Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The second statement was made in response to Ada's accusation that "Randy

shot Bob Bishop," to which McKinney replied, "I didn't shoot anybody." The second statement was not elicited by any police questioning; it was merely a volunteered response by McKinney to the accusation of Ada. We find no error in the admission of either of the two statements.

■ It is next asserted that the false oral statement given by McKinney prior to the time that the written *Miranda* waiver form was produced should have been suppressed. We disagree. There is no argument but that the *Miranda* warnings were given and McKinney verbally waived them prior to his verbal statement. Hence, that statement was not given in violation of the federal constitution. It is argued, however, that, since the waiver was not signed until after the false verbal statement was given, under I.C. § 19–853, the waiver did not become effective until that moment and any statement given prior thereto was inadmissible. We disagree. There is no argument but that McKinney was read the *Miranda* rights and verbally agreed to waive them and to voluntarily give statements. There is likewise no question but that shortly thereafter McKinney was furnished a written form of the *Miranda* rights, which was the same as the form read to him, and he read the written form, initialed each part thereof, and signed that form. We will not hold that a short lapse of time between a verbal reading of the *Miranda* rights and McKinney's written execution of the *Miranda* waiver form is such police behavior as to require the exclusion of relevant evidence as a disciplinary measure. *See State v. Gibson,* 106 Idaho 54, 675 P.2d 33 (1983).

■ McKinney next asserts that the trial court erred in admitting certain testimony of Denise Garner and contends that such testimony was inadmissible hearsay. Garner first testified to the conversation between Small and McKinney as to their plans to shoot Bishop and steal his credit cards. On cross-examination, the defense attempted to impeach Garner by showing that she did not give the police that version of her story until several weeks after the

event. The State thereafter, in an attempt to rehabilitate the testimony of Garner, called Tana Hampton, who testified that on the day following the event, Garner related to Hampton the conversation between Small and McKinney. Garner's statements to Hampton were designed to indicate that Garner did not fabricate the story several weeks later, and the judge instructed the jury not to consider Hampton's testimony regarding the conversation for the truth of the matter asserted.

Garner's statement to Hampton was not offered to prove the truth of the matter asserted therein and hence was not hearsay. *Isaacson v. Obendorf,* 99 Idaho 304, 581 P.2d 350 (1978); *Furness v. Park,* 98 Idaho 617, 570 P.2d 854 (1977); *Patino v. Grigg & Anderson Farms,* 97 Idaho 251, 542 P.2d 1170 (1975). Wigmore on Evidence states that "this use of former similar statements is universally conceded to be proper," and continues

> "The effect of the evidence of consistent statements is that the supposed fact of not speaking formerly, from which we are to infer a recent contrivance of the story, is disposed of by denying it to be a fact, inasmuch as the witness did speak and tell the same story...." J. *Wigmore on Evidence* (Chadbourne ed.), § 1129 at 271 (1972).

*See also McCormick on Evidence,* Cleary ed., § 244 (2d ed. 1972); 3 Wigmore on Evidence (Chadbourne ed.) § 1122 (1972). *See FED.R.EVID.* 801(d)(1)(B), to which the Advisory Committee's Note states:

> "Prior consistent statements traditionally have been admissible to rebut charges of recent fabrication or improper influence or motive but not as substantive evidence. Under the rule they are substantive evidence. The prior statement is consistent with the testimony given on the stand, and, if the opposite party wishes to open the door for its admission in evidence, no sound reason is apparent why it should not be received generally."

Hence, we find no error in the admission of the testimony. However, we need not determine whether, as under the federal

rules, the evidence would also have been admissible as substantive evidence.

■ McKinney next asserts that a mistrial should have been declared because he was taken to and from the courtroom in handcuffs. There is no showing here, nor was there at the trial court, that any juror observed McKinney in handcuffs. Defense counsel asserted to the trial court that McKinney was being handcuffed by the sheriff while some jurors were still in the courtroom. At that point the trial court instructed the sheriff to be certain that all jurors had left the courtroom before McKinney was handcuffed. The mere possibility that some juror may have seen McKinney in handcuffs does not satisfy appellant's burden of showing prejudicial error on appeal. *Annau v. Schutte*, 96 Idaho 704, 535 P.2d 1095 (1975); *see Rueth v. State*, 100 Idaho 203, 596 P.2d 75 (1978).

■ McKinney next asserts error in the improper publication of the deposition of Dovey Small. That deposition was published, since Small was unavailable due to problems with pregnancy. McKinney sought to have the deposition published in full, including conferences with counsel and Small's invocation of the Fifth Amendment. I.R.C.P. 32(a)(4) states that, "so far as admissible under the rules of evidence applied as though the witness were then present and testifying," "[i]f only part of a deposition is offered in evidence by a party, an adverse party may require him to introduce any other part which *ought in fairness* to be considered with the part introduced, and any party may introduce any other parts." (Emphasis supplied.) Those portions of depositions which "in fairness" should or should not be admitted lies within the discretion of the trial court. *Maryland Metals, Inc. v. Metzner*, 282 Md. 31, 382 A.2d 564 (1978); *see also Spencer v. Dupree*, 150 Ga.App. 474, 258 S.E.2d 229 (1979); *Dombrowski v. Laschinski*, 67 Ill. App.3d 506, 24 Ill. Dec. 268, 385 N.W.2d 35 (1978); *Socha v. Passino*, 405 Mich. 458, 275 N.W.2d 243 (1979); *In re Nordstrom*, 264 N.W.2d 629 (Minn.1978); *Omaha Nat. Bank v. Mfrs. Life Ins. Co.*, 213 Neb. 873,

332 N.W.2d 196 (1983). The prior testimony made clear and no one in the courtroom, including the jury, could have been unaware that Dovey Small was an alleged co-conspirator in the murder-robbery of Bishop. There is no indication as to how a showing of Small's invocation of the Fifth Amendment or her conferences with her counsel would have either prejudiced or aided McKinney's case. We find no abuse of discretion by the trial court in excluding portions of the deposition.

■ McKinney also asserts error by the trial court in its sustaining an objection to the introduction of a statement made by Small in her deposition that she had been previously convicted of a felony. I.R.C.P. 43(b)(6) states, in pertinent part, that: "upon a finding by the court in a hearing outside of the presence of the jury that a prior conviction of a felony of a witness is relevant to his credibility, it then may be shown ... that he has been convicted of a felony...." Thus, the trial court must determine if a prior felony conviction is relevant to a witness's credibility prior to the time such testimony is admitted. Here the trial court indicated the testimony was not relevant, and we find no abuse of discretion in that ruling on relevance. The record before us only indicates a sidebar conference and no reasons stated for either the objection or the ruling. The State insists that the objection was made and sustained because Small never had been convicted of a felony. Such, however, does not appear on the records of either this case or State v. Small. A presentence report contains a list of offenses for which Small had been convicted but no indication thereon as to whether the offenses were felonies or misdemeanors. Even assuming that the evidence was erroneously excluded, we hold beyond a reasonable doubt that no prejudicial error occurred. *See State v. Sharp*, 101 Idaho 498, 616 P.2d 1034 (1980). Here there was overwhelming evidence as to Small's part in the planning of the brutal murder of Bishop, and any supposed further impeachment of her character could add little, if anything, to the defense case

**186**

of McKinney. If omission of the evidence was erroneous, it was harmless. I.C.R. 52.

■ McKinney next asserts that the prosecuting attorney made improper statements during opening and closing arguments. We find no error. *See Hawes v. State*, 240 Ga. 327, 240 S.E.2d 833 (1977); *Jackson v. State*, 219 Ga. 819, 136 S.E.2d 375 (1964); *Chambers v. State*, 134 Ga. App. 53, 213 S.E.2d 158 (1975); *State v. Gibson*, 106 Idaho 54, 675 P.2d 33 (1983); *State v. Larsen*, 81 Idaho 90, 337 P.2d 1 (1959).

■ Appellant next asserts the trial court did not properly consider aggravating and mitigating factors as required by I.C. § 19–2515 and *State v. Osborn*, 102 Idaho 405, 631 P.2d 187 (1981). We disagree. The trial court properly considered mitigating circumstances and found them not to outweigh the aggravating circumstance that McKinney committed murder in the first degree in the perpetration of a robbery "accompanied with a specific intent to cause the death of Robert M. Bishop, Jr., a human being." We find no error.

■ Finally, it is asserted that under our proportionality review mandated by I.C. § 19–2827(c)(3), "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Here, McKinney's primary allegation is that error was committed in sentencing him to death while Small was only sentenced to life imprisonment. The differences in the sentences of McKinney and Small is justified by the varying degrees of involvement in the crime. While both McKinney and Small planned and conspired to kill Bishop for his car, money and credit cards, it was McKinney who entrapped the victim and carried out the actual killing. The differences in the degrees of participation in the actual killing justifies the differences in the sentences. *See State v. Bainbridge*, —— Idaho ——, 698 P.2d 335 (1984), and *State v. Sivak*, 105 Idaho 900, 674 P.2d 396 (1983). Further as mandated by I.C. § 19–2827(c), we have reviewed other cases involving the death penalty for purposes of determining if the sentence in the instant case is excessive or disproportionate. We find the sentence in the instant case is not excessive or disproportionate. In no other case have we seen such a cold-blooded, callous and wanton plan to murder a relative stranger for the sole motive of monetary gain, coupled with the method of killing, *i.e.*, enticement of the victim to a remote area, shots to the body, and then a deliberate and calculated placing of, execution fashion, shots to the back of the victim's head. *Compare, State v. Creech*, 105 Idaho 362, 670 P.2d 463 (1983); *State v. Sivak, supra; State v. Paradis*, 106 Idaho 117, 676 P.2d 31 (1983); and *State v. Gibson*, 106 Idaho 54, 675 P.2d 33 (1983).

The convictions and the sentence are affirmed.

DONALDSON, C.J., and BAKES and HUNTLEY, JJ., concur.

BISTLINE, Justice, concurring only in affirming the conviction.

As I noted in *State v. Aragon*, 107 Idaho 358, 690 P.2d 293 (# 14771) (June 22, 1984), proportionality in death sentencing as once mandated by the Supreme Court of the United States, would be a dead issue other than for the fact that it is required by our Idaho statutory law which is a byproduct of those remarkable decisions of the High Court which served to destroy what in Idaho *had been* a fair and constitutional system of capital sentencing. It is not easy to rationalize the sentence which was here imposed, as compared to the sentence in *State v. LaMere*, 103 Idaho 839, 655 P.2d 46 (1982), both at the hands of the same district judge, who had before him defendants convicted of senseless and callous murders. Nor is it readily discerned that there is proportionality in the sentence meted out to McKinney, as compared to the lesser sentence awarded Dovey Small, also convicted of the same murder. The State of Idaho agrees, and in her case, 107 Idaho 504, 690 P.2d 1336 (# 14701), in this Court, argues that she, too, should be handed the death sentence.

The defendant's main premise in this case is the injustice of the sentence. A jury, in all likelihood, would have imposed like sentences, and in that manner, not only would the requirements of the Idaho Constitution have been fulfilled, but there would be a return to the only semblance of proportionality which is realistically attainable. I point to that which Justice Blackmun, writing for the High Court in *Spaziano v. Florida*, — U.S. —, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), pointed out:

> "Petitioner's primary argument is that the laws and practice in most of the States indicate a nearly unanimous recognition that juries, not judges, are better equipped to make reliable capital-sentencing decisions and that a jury's decision for life should be inviolate. The reason for that recognition, petitioner urges, is that the nature of the decision whether a defendant should live or die sets capital sentencing apart and requires that a jury have the ultimate word. Noncapital sentences are imposed for various reasons, including rehabilitation, incapacitation, and deterrence. In contrast, the primary justification for the death penalty is retribution. As has been recognized, 'the decision that capital punishment may be the appropriate sanction in extreme cases is an expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death.' [*Gregg v. Georgia*, 428 U.S. 153, at 184 [96 S.Ct. 2909, at 2930, 49 L.Ed.2d 859] (1976)]. The imposition of the death penalty, in other words, is an expression of community outrage. Since the jury serves as the voice of the community, the jury is in the best position to decide whether a particular crime is so heinous that the community's response must be death. If the answer is no, that decision should be final." (at — – —, 104 S.Ct. at 3163)

In footnote 8 of that opinion he adds that "we have no particular quarrel with the proposition that juries, perhaps, are more capable of making the life-or-death decision in a capital case...," and in footnote 9 categorizes Idaho as being among the four states where "the court alone imposes the sentence." If but one more member of this Court would remember a justice's sworn obligation to uphold the Constitution of the state of Idaho, that number would be reduced to three. *See*, dissenting opinion of Bistline, J., and Huntley, J., in *State v. Creech*, 105 Idaho 362, 670 P.2d 463 (1983).

HUNTLEY, Justice, concurring specially.

I concur in the majority opinion and in the imposition of the death sentence with the caveat and reservation that I remain of the opinion that the Idaho capital sentencing process is unconstitutional in two respects:

(1) It does not provide for utilization of the jury, which is in violation of both the Idaho and United States constitutions; and

(2) The sentencing proceeding, as conducted by the trial courts with the approval of this court, by permitting the admission of the presentence investigation report and other hearsay evidence over objection of the accused deprives the accused of the right to cross-examine and confront witnesses.

My reasoning in this regard is set forth in detail in my dissenting opinions in *State of Idaho v. Creech*, 105 Idaho 362, 670 P.2d 463 (1983), and *State of Idaho v. Sivak*, 105 Idaho 900, 674 P.2d 396 (1983).