150 P.3d 283

**Randy Lynn McKINNEY,**
**Petitioner–Appellant,**

v.

**STATE of Idaho, Respondent.**

No. 29411.

Supreme Court of Idaho,
Boise, December 2006 Term.

Dec. 19, 2006.

Federal Defenders of Eastern Washington and Idaho, Moscow, for appellant. Joan M. Fisher argued.

Hon. Lawrence G. Wasden, Attorney General, Boise, for respondent. L. LaMont Anderson argued.

EISMANN, Justice.

This is an appeal from a successive petition for post-conviction relief alleging prosecutori-

al misconduct during the defendant's trial. The district court denied relief, and we affirm.

## I. FACTS AND PROCEDURAL HISTORY

Randy McKinney was convicted of murder in the first degree, conspiracy to commit murder, robbery, and conspiracy to commit robbery, and he was sentenced to death. This Court affirmed his convictions and sentence in *State v. McKinney*, 107 Idaho 180, 687 P.2d 570 (1984). He subsequently filed two petitions for post-conviction relief, both of which the district court denied. We affirmed the district court in both cases. *McKinney v. State*, 115 Idaho 1125, 772 P.2d 1219 (1989); *McKinney v. State*, 133 Idaho 695, 992 P.2d 144 (1999). On June 30, 2001, McKinney filed a third petition for post-conviction relief. The denial of that petition is the subject of this appeal.

It is not necessary to recount the overwhelming evidence of McKinney's guilt presented at the trial. In McKinney's appeal from his conviction and sentence, this Court summarized what occurred, "In no other case have we seen such a cold-blooded, callous and wanton plan to murder a relative stranger for the sole motive of monetary gain, coupled with the method of killing, *i.e.*, enticement of the victim to a remote area, shots to the body, and then a deliberate and calculated placing of, execution fashion, shots to the back of the victim's head." *State v. McKinney*, 107 Idaho 180, 186, 687 P.2d 570, 576 (1984).

McKinney's third petition for post-conviction relief is based upon the allegation that one of the prosecuting attorneys tampered with McKinney's revolver by increasing its double-action trigger pull in order to cast doubt upon McKinney's claim that he accidentally shot his victim. At his trial, McKinney testified as follows: He rode with the victim out into the country to do some target practice with McKinney's .22–caliber, double-action revolver. As McKinney stood five or ten feet from the car, the victim walked to two fence posts and placed a soda bottle on each of them to be used as targets. A Pomeranian dog belonging to McKinney's fe-

male companion was also there. It began tugging at McKinney's pant leg in a playful manner as the victim was walking back toward the car. McKinney was holding the revolver straight out from his shoulder in the direction of the bottles, and as he looked down at the dog he accidentally pulled the trigger, hitting the victim in the torso. The victim fell to the ground, and McKinney immediately put the dog back into the car, got in the driver's seat, and drove back to the bar where McKinney's companion and her sister were waiting. After the two women were in the car, the sister asked where the victim was, and McKinney said he had accidentally shot him. The two women expressed disbelief, so he drove them back to the scene, where the victim was still lying on the ground. McKinney got out of the car, leaving the revolver wedged between the console and the driver's seat. McKinney's companion was riding on the console, and she also got out, taking the revolver with her. The female companion walked over to the victim and shot him multiple times in the head. McKinney had no idea she was going to do that, and he ran over and grabbed the revolver away from her.

McKinney testified that he accidentally fired the revolver in double-action mode. When asked at trial to demonstrate how he could have accidentally shot the victim in the manner he claimed, McKinney refused to do so.

The shot that McKinney admitted firing hit the victim in the chest, but it was not a fatal wound. It may have incapacitated him because it lodged in the tenth thoracic vertebrae. Although it did not damage the spinal cord, it may have sent shock waves through the spinal cord when it hit the vertebrae. The effect of these shock waves on the spinal cord may have incapacitated the victim. As the victim was lying on the ground, he was shot four times in the back of the head. These four bullets all did massive destruction to his brain and brain stem, killing him.

After McKinney testified, the State called a firearms expert who testified that the double-action trigger pull of McKinney's revolver was twenty-one pounds. The trigger pull

is an expression in pounds of how much force must be applied to the trigger in order for it to cock the hammer, rotate the cylinder, and fire the shot. McKinney's revolver was an inexpensive, cheaply made handgun of the type often called a "Saturday night special." Unfortunately, the current location of the revolver is unknown.

During federal habeas corpus proceedings, McKinney obtained a hand-printed note from the files of the prosecuting attorneys. That note stated as follows:

Prepare:

-Trigger Pull Examination

-Handwriting

-Dr. Garrison

-Tighten gun cylinder

-Ask Darrel for transcript of McKinney Testimony

McKinney then deposed both prosecuting attorneys who participated in his trial. One of them stated that the note was in his handwriting and that he made it during the trial after McKinney had testified. The prosecutor testified that he had no expertise in guns, that he would not know how to tighten a gun's cylinder,[1] that he had no idea why he wrote "Tighten gun cylinder" or what it meant, and that to his knowledge the cylinder of McKinney's gun had not been tightened. The other prosecuting attorney knew nothing of the note, never discussed having the gun cylinder tightened, and was sure they would not have altered the revolver. McKinney contends that the note shows that the prosecuting attorney altered the revolver by tightening its cylinder, thereby increasing its trigger pull.

The State sought summary dismissal of McKinney's third petition on the grounds that McKinney failed to show that this claimed prosecutorial misconduct could not have reasonably been known when he filed his first two petitions for post-conviction relief and that the issues raised were not material, but merely impeachment. McKinney moved for summary judgment, asking the district court to find that there was prosecutorial misconduct that warranted a new trial or a new sentencing hearing. After hearing

argument on the motions, the district court held that the memo was merely impeachment evidence and that evidence of the alleged prosecutorial misconduct, assuming it had occurred, would not have altered the outcome of the trial. McKinney then appealed.

## II. ISSUES

1. Did the district court err in dismissing McKinney's petition for post-conviction relief?

2. Should this Court overrule *Schriro v. Summerlin*, 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004)?

## III. ANALYSIS

### A. Did the District Court Err in Dismissing McKinney's Petition for Post-Conviction Relief?

The district court dismissed McKinney's third petition for post-conviction relief on the ground that the prosecutor's handwritten memo was not material, was impeachment evidence, and would not result in a different outcome at trial. For three reasons, we affirm the judgment of the district court.

■ First, there is no evidence of prosecutorial misconduct. The State had the firearms expert examine McKinney's revolver about six months prior to trial in order to determine whether bullet fragments found in the victim's body were fired from McKinney's revolver. In connection with that examination, the expert worked the action twenty to thirty times and noticed that the double-action trigger pull was excessive. After McKinney had testified, the expert again examined the revolver using a trigger-pull gauge to measure the weight of its trigger pull. That is when he determined that the double-action trigger pull was twenty-one pounds. When asked whether the revolver had been tampered with or altered in any way since his first examination of it about six months earlier, he responded, "There are no indications of tampering whatsoever. The trigger, to the best of my recollection, appeared to be the same in its action." Thus,

---

1. There is nothing in the record indicating how

the cylinder of the revolver could be tightened.

even if the note indicated an intent by the prosecuting attorney to alter the revolver, there is absolutely no evidence that the prosecuting attorney acted upon that intent or that the trigger pull was altered. In fact, the uncontradicted evidence is to the contrary.

McKinney accuses the expert of lying to cover up the alteration of the revolver, but he offers absolutely no evidence to support that accusation. He simply speculates that the prosecuting attorney and the expert conspired to provide false testimony. A mere accusation supported solely by speculation is not a sufficient basis for granting post-conviction relief.

■ Second, McKinney's petition raising this issue is untimely. In a capital case, the petitioner filing a successive petition for post-conviction relief must make a prima facie showing that the issues raised were not known and could not reasonably have been known within forty-two days after entry of the judgment imposing the death sentence. *McKinney v. State,* 133 Idaho 695, 992 P.2d 144 (1999). "Even when the required prima facie showing is made, the issues must still be asserted 'within a reasonable time' after they are known or reasonably could have been known." *Id.* at 701, 992 P.2d at 150.

If we assume, even in the absence of any evidence supporting the assumption, that the trigger pull of the revolver had been altered to make it heavier, McKinney would have known of that at his trial in November 1981. He admittedly fired the first shot that hit the victim, claiming he did it accidentally. If the revolver's double-action trigger pull was so light that he could have accidentally fired the gun in the manner he claimed, he should reasonably have known something was wrong when he heard the State's firearms expert testify that the trigger pull was one of the heaviest he had ever encountered. Yet, McKinney did nothing to investigate whether the trigger pull had been altered. Under the circumstances, the lapse of almost twenty years is not a reasonable time to wait before raising the possibility that the trigger pull may have been altered.

■ Third, there is no basis for concluding that the note would likely have had any impact on the outcome of McKinney's trial. McKinney argues that the prosecutors were required to disclose the note pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In *McKinney v. State,* 133 Idaho 695, 706, 992 P.2d 144, 155 (1999) (citations omitted), we set forth the analysis under *Brady* as follows:

The due process guarantees of the Fifth and Fourteenth Amendments to the United States Constitution mandate that the prosecution disclose exculpatory evidence in the government's possession to an accused person. The duty to disclose is irrespective of good or bad faith on the prosecution's part.

The defendant's right to due process is violated where the prosecution fails to disclose exculpatory evidence that is material either to guilt or punishment. Evidence is material for purposes of due process analysis "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." The prosecution does not violate the constitutional duty of disclosure unless the nondisclosure "is of sufficient significance to result in the denial of the defendant's right to a fair trial." "[T]he question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" Whether evidence is material for purposes of due process analysis is a question of law, over which this Court exercises free review.

■ McKinney correctly argues that *Brady* requires the disclosure of impeachment evidence. *Dunlap v. State,* 141 Idaho 50, 106 P.3d 376 (2004). He claims, "Arguably the credibility of [the firearms expert's] testimony directly related to Petitioner's guilt or innocence in light of Petitioner's claim of an accidental shooting as a defense." The note could not have been used to impeach the firearms expert called by the State. That expert did not author the note. McKinney did not seek to depose the expert in this proceeding, and there is no evidence that the expert was aware of or knew anything about the note, that he had ever been asked to

tighten the gun's cylinder, or that he had ever done so.

McKinney also argues that the alleged alteration of the revolver's trigger pull was not merely impeachment evidence, but it undermined his defense of accidental discharge. At most, the note would have created a suspicion that the prosecutor may have done something to the revolver that he described as "Tighten gun cylinder." Absent evidence that the revolver was actually altered in some way, disclosure of the note would not likely have had any impact upon the outcome of the trial, nor would it have put the whole case in such a different light as to undermine confidence in the verdict.

Even if we were to speculate that the prosecuting attorney did in some way alter the revolver to increase the weight of its trigger pull, such assumed fact would not likely have had any impact upon the outcome of the trial, nor would it have put the whole case in such a different light as to undermine confidence in the verdict. McKinney's handgun was a double action revolver. It could be fired double action or single action. When a revolver is fired double action, the trigger finger must apply enough force to the trigger to cock the hammer, thereby compressing the hammer spring. When a revolver is fired single action, the hammer is manually cocked first, which compresses the hammer spring so that it need not be compressed by pulling on the trigger. As a result, the weight of the single action trigger pull is about half that of the double action trigger pull. In addition, when the hammer is manually cocked, it also causes the trigger to move to the rear, shortening the distance that the trigger must be pulled in order to fire the revolver. It is in single action mode that a revolver may have a "hair trigger." The double action trigger pull is longer and heavier. McKinney testified that, when he was distracted by the Pomeranian dog playfully tugging at his pant leg, he accidentally fired the revolver in double action mode (without first cocking the hammer), hitting the victim. That scenario is simply not credible.

The State's firearms expert testified that most revolvers when new have a fifteen pound or less double action trigger pull and that the trigger pull will lessen with time and use or if altered by a gunsmith. He also testified that a gunsmith would set the double action trigger pull of a target revolver at five to seven pounds and the double action pull of a police revolver at seven to nine pounds. There is no evidence that the double action trigger pull of McKinney's revolver had been reduced, or that it had previously been used as a target or police revolver. Thus, had the prosecutor altered the double action trigger pull of McKinney's revolver, such alteration would have increased the double action trigger pull by approximately six pounds-from about fifteen to twenty-one pounds. McKinney's version of what happened would not have been more believable had the double action trigger pull been around fifteen pounds rather than twenty-one.

The shot McKinney admits firing did not kill the victim. It was the four shots to the back of the victim's head that were fatal. McKinney claimed that his female companion fired those shots without him knowing she would do so. There was ample evidence supporting the jury's finding that McKinney fired the fatal shots. See *State v. McKinney*, 107 Idaho 180, 182–83, 687 P.2d 570, 572–73 (1984), wherein we recited that evidence. There is no reasonable likelihood that the prosecutor's note, or even evidence that the prosecutor had altered the revolver to increase its trigger pull, would have altered the jury's decision regarding who fired the four fatal bullets into the back of the victim's head.

Finally, McKinney asks us to speculate that the prosecuting attorney altered the revolver's trigger pull without any evidence supporting that speculation after having admitted that he murdered the victim. He testified in his first post-conviction proceeding:

Q. Randy, do you deny killing Robert Bishop?

A. No. I'm not proud of it, but I don't deny it either. It's something that shouldn't have happened. Just because I don't break down and cry in front of everybody doesn't mean I don't feel remorse for what I've done. But—I've cried several

times in private. You know? I'm completely ashamed of what happened. If giving my life would bring Robert back, I'd readily do it with no hesitation or reservation. But it's not going to bring him back. He also admitted that he lied at his trial when testifying as to his version of what occurred. At his first post-conviction proceeding, McKinney contended that he had become very angry when the victim allegedly made homosexual advances towards him and asked to have sex with his female companion.

Certainly, McKinney's actual guilt would not excuse wrongful conduct by the prosecuting attorney. Justice would certainly not be served, however, by setting aside McKinney's conviction for a crime he admits committing based solely upon unsubstantiated speculation of prosecutorial misconduct.

### B. Should this Court Overrule *Schriro v. Summerlin,* 542 U.S. 348 (2004)?

In *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the United States Supreme Court held that the Sixth Amendment's jury trial guarantee requires that a jury, not a judge, find an aggravating circumstance necessary for the imposition of the death penalty. In *Schriro v. Summerlin,* 542 U.S. 348, 358, 124 S.Ct. 2519, 2526, 159 L.Ed.2d 442, 453 (2004), the Supreme Court held, "*Ring* announced a new procedural rule that does not apply retroactively to cases already final on direct review." McKinney asks us to hold that *Ring* is retroactive, thereby overruling *Summerlin.* The retroactivity of *Ring* was a matter of federal constitutional law, not state law. We have no authority to overrule decisions of the United States Supreme Court on issues of federal constitutional law.

### IV. CONCLUSION

We affirm the dismissal of McKinney's third petition for post-conviction relief.

Chief Justice SCHROEDER, Justices TROUT, BURDICK and Justice Pro Tem KIDWELL concur.